IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 11, 2025

**STATE OF TENNESSEE v. JUWAN JAHEIM GAINES**

**Appeal from the Criminal Court for Davidson County**
**No. 2021-B-797      Jennifer L. Smith, Judge**

———————————

**No. M2023-01389-CCA-R3-CD**

———————————

The Defendant, Juwan Jaheim Gaines, appeals from his convictions for attempted first degree premeditated murder wherein the victim suffered serious bodily injury, employing a firearm during the commission of a dangerous felony, and reckless endangerment with a deadly weapon. He asserts that the trial court's refusal to instruct the jury on self-defense constitutes reversible error, that the evidence was insufficient to support his convictions, and that the trial court abused its discretion by imposing an excessive sentence. After review, we remand the case to the trial court for entry of corrected judgment forms. In all other respects, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed;**
**Case Remanded**

KYLE A. HIXSON, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, P.J., and JOHN W. CAMPBELL, SR., J., joined.

Jay Umerley (on appeal) and Nicholas McGregor (at trial), Nashville, Tennessee, for the appellant, Juwan Jaheim Gaines.

Jonathan Skrmetti, Attorney General and Reporter; Raymond J. Lepone, Assistant Attorney General; Glenn R. Funk, District Attorney General; and David Jones and Doug Thurman, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I.    FACTUAL AND PROCEDURAL HISTORY

On September 30, 2020, the Defendant accompanied his lifelong friend, Kodi Holdeman, and Mr. Holdeman's girlfriend at the time, MacKenzie Duncan, to the Opry Mills Mall on a shopping trip. While the trio was walking inside the mall, the Defendant removed a gun from his waistband, pulled back the slide to chamber a round, and fired three shots at the victim, Michael Pignone, one of which hit him in the chest. On May 20, 2021, a Davidson County grand jury indicted the Defendant for this conduct, charging him with attempted first degree premeditated murder wherein the victim suffered serious bodily injury, employing a firearm during the commission of a dangerous felony, and reckless endangerment with a deadly weapon. *See* Tenn. Code Ann. §§ 39-12-101; -13-103, -202; -17-1324. Following a jury trial in March 2023, the Defendant was convicted as charged, and he received an aggregate sentence of twenty-one years to serve in the Tennessee Department of Correction ("TDOC").

The proof introduced at trial included video surveillance from inside the mall that captured the shooting. On the video, the Defendant is visible walking toward the camera just behind two adults and a small child. The victim enters the frame of the video, on the same side of the mall as the Defendant, walking away from the camera. The victim's left arm is visible at his side, but his right arm is stationary in front of his body with his hand near the center of his waistline. The victim and several other individuals are walking and talking together in a group, and none of them appear to have noticed the Defendant as the two groups approached each other. By contrast, the Defendant is looking directly at the victim's group when he removes a gun from under his shirt, holds it pointed toward the ground with both hands as he advances a round into the chamber, then raises it with both hands and points it at the victim over the heads and shoulders of the adults and child that are between him and the victim's group. Mr. Holdeman briefly pushes the Defendant's arm down after the gun is raised before he runs away from the Defendant. The Defendant raises the gun with both hands again and three flashes are visible from the muzzle before he too runs out of the frame. One of the individuals in the victim's group, Caleb Ols, can be seen running to the other side of the mall, pulling out a gun, and pointing it in the general direction of where the Defendant fled, before he also runs out of the frame in the opposite direction. The victim falls to the ground and begins dragging himself along the floor into a nearby store, but he is eventually assisted across the mall and out of the video frame.

Ms. Duncan testified that she had gone to the mall with Mr. Holdeman and the Defendant, but this was the first time she had met the Defendant. She did not know the

victim or any of the people surrounding him. Ms. Duncan did not see anyone with a gun, but she "ducked and ran" out of the mall after she heard two to three gunshots. When she and Mr. Holdeman arrived at her vehicle in the mall parking lot, the Defendant was already there, and he apologized "for the situation." Ms. Duncan drove the three of them away from the mall and gleaned that the Defendant had been the shooter based on his conversation with Mr. Holdeman in the car.

The victim testified that he knew he had been shot and had to undergo several surgeries due to his injuries, but he had no memory of being in the hospital and did not know how many or what type of surgeries he had while admitted. He confirmed that he had been injured in the chest and displayed his scars to the jury. The victim was eventually able to identify himself on the surveillance video, which he had not reviewed before it was shown to him at trial, but he did not remember being at the mall or any portion of the rest of the day. He stated that he had "[n]ever seen [the Defendant]" before and did not know him at the time he was shot.

The jury heard testimony from Mr. Holdeman, who had been declared an unavailable witness by the trial court, in the form of his previously recorded preliminary hearing testimony.[1] He acknowledged that he had gone to the mall that day with the Defendant and Ms. Duncan, but in the moments prior to the shooting, the Defendant was behind them and "wasn't really engaging" with either of them. Mr. Holdeman said he "heard the gun cock," turned and saw the Defendant holding it, and he then ran away. He estimated that he heard four to six gunshots, but he did not see the shooting. When he and Ms. Duncan arrived at the car, the Defendant was there waiting for them and the three of them got into the car and left the area. Mr. Holdeman stated that the Defendant "kept apologizing" and then "got on the phone" with someone else. Up until they dropped the Defendant off, Mr. Holdeman repeatedly asked the Defendant what had happened but received no response. He stated that prior to the shooting, he did not know the Defendant had a gun with him or that the Defendant had a "beef" with anyone, but he was aware that the Defendant had been shot a few months prior to this.

Personnel with the Metro Nashville Police Department ("MNPD") responded to the mall following the shooting. Claire Vondohlen testified that she was the forensics technician who marked and photographed the interior scene of the shooting. She identified three spent .40-caliber casings she found grouped close together inside the mall and a fourth that was found in a different area of the concourse. While four casings were recovered, Ms. Vondohlen testified that only some of the associated bullet fragments were located,

---

[1] *See* Tenn. R. Evid. 804(a)(5), (b)(1).

and she agreed that the remaining fragments "could have been anywhere in the mall" because the open concourse of the building was "very long and straight."

Sergeant Donnell Barr, also with MNPD, testified that he was the lead investigator on this case and that he had reviewed the surveillance video collected from the mall. As the video was again played for the jury, Sgt. Barr observed that the victim and his group "were just walking kind of nonchalantly" and did not seem aware of the Defendant's presence. Sgt. Barr stated that when the Defendant began shooting, everyone in the victim's group, as well as anyone not in view of the camera behind that group, were "in the line of fire" based on his observation of the video. He also noted that nothing fell out of the victim's clothing when he collapsed, and no indication that the victim had a firearm or other weapon surfaced during the investigation following the shooting. He interviewed the victim in the hospital on October 3, 2020, but the victim did not know who had shot him. However, MNPD received an anonymous email identifying the Defendant as the shooter as well as information from the Wilson County Sheriff's Office that the Defendant was "bragging" about the shooting in that jurisdiction. After seeing Ms. Duncan make a purchase on the surveillance video, Sgt. Barr identified her by using the store's rewards card information. Once he located her, Ms. Duncan identified the Defendant as the shooter in a photographic lineup containing six individuals. Through Ms. Duncan, Sgt. Barr located and interviewed Mr. Holdeman, who stated he had known the Defendant nearly all of his life, and he also identified the Defendant as the shooter. After warrants were issued for his arrest, the Defendant surrendered to law enforcement on October 6, 2020. After introducing voluminous medical records documenting the injuries suffered by the victim, the State rested its case in chief.

Justus Willis testified as a defense witness. He stated that he had been working at Lids Locker Room in the mall at the time of the shooting, and, when he heard gunshots, he went to close and secure the doors. While doing so, he saw a white male with a "man bun" holding a gun.[2] Mr. Willis was unsure whether he saw the man "cock" or load the gun.

The Defendant testified that he went to the mall with Mr. Holdeman and Ms. Duncan that day, and the three of them went to several stores while there. Upon exiting one of the stores, the Defendant stated he saw Mr. Ols, whom he recognized but did not "really know" personally. The Defendant related to the jury that he had been shot a few months before this when he was a bystander at a convenience store robbery. The Defendant claimed that, after he informed law enforcement that he did not know who had shot him, he began receiving threatening messages from Mr. Ols warning him "not to go back to the police." In response, the Defendant took classes at a shooting range and bought a gun that he carried

---

[2] This description is consistent with the physical appearance of Mr. Ols on the surveillance video.

with him daily from that point. When he saw Mr. Ols in the mall, the Defendant claimed that he believed he was about to die, which prompted him to fire his gun. However, the Defendant stated that he was not aiming for Mr. Ols because he could see his hands, which meant to the Defendant that Mr. Ols was not a threat. Instead, he "was aiming for [the victim]" because he had his "hands inside his pants," and he believed the victim was "the danger . . . who was going to shoot [him]." The Defendant maintained that he still believed the victim had a weapon and he hoped that he "made the right decision" by shooting him. However, no evidence was introduced to support the proposition that the victim had been armed at the time of the shooting other than the Defendant's subjective belief.

The Defendant stated that, some hours after the shooting, he received a Snapchat video message from Mr. Ols, which was introduced as an exhibit and played for the jury. In the Snapchat video, Mr. Ols appears to be at the mall, displays the handle of a gun concealed within his clothing, and states "come back" multiple times. However, the gun is a different color than the gun Mr. Ols was seen holding in the mall surveillance video, and he also appears to be wearing different clothing. The Defendant stated that he did not respond to the message but instead took his gun home with him and "then turned [him]self in" to the authorities. He explained that he waited a week to do so because he was overwhelmed and scared, and he also denied ever having boasted about committing the shooting.

On cross-examination, the Defendant acknowledged that he had never met Mr. Ols or the victim before the day of the shooting, and he had no proof of the threats he claimed to have received from Mr. Ols prior to the shooting. The Defendant also agreed that the victim "could have" been holding up his sagging pants as he was walking through the mall. When asked why he did not turn around and walk the other way to preserve his safety instead of shooting the victim, the Defendant stated that he could "easily be spotted" because of his hairstyle and the fact that his COVID mask was "too low" on his face. He also claimed to "know" that Mr. Ols was the person who had shot him previously, despite having stated earlier during his testimony that he did not know who had shot him. The Defendant confirmed that he knew other people were in the mall at the time of the shooting, who were entirely unrelated to either group. When asked whether he cared if the bullets struck someone else, the Defendant stated that he "couldn't think about that" because he was concerned with saving his own life.

The defense lastly called Mr. Ols to testify, who acknowledged that he had been present at the shooting and was carrying a gun. However, Mr. Ols stated that he did not know the Defendant, and he did not recall ever having threatened him. He likewise did not

recall ever sending the Defendant any Snapchat videos. Mr. Ols further stated that he was intoxicated at the time of the shooting and that he did not remember what happened.

Following the close of the proof, the defense requested a jury instruction on self-defense. In opposition to this request, the State submitted caselaw for the trial court to consider in concert with the facts of this case. The State then argued that the Defendant's "transferred fear" of Mr. Ols onto the victim did not make the victim an imminent threat, and the Defendant was the first aggressor, not the victim. The defense responded that the Defendant "was in reasonable fear and it was his perception" that he needed to defend himself. However, the trial court responded to this argument by stating, "[Y]ou can't just run around shooting people because you think that they might be dangerous. If you eliminate the requirement that there be some element of initial aggression by the victim . . . that opens up all kinds of cans of worms."

Ultimately, the trial court found that

> [T]here was no indication that [the victim] made any aggressive use, aggressive moves toward the [D]efendant. No words were exchanged between the two. No guns were drawn. [The victim] was by all accounts and . . . from the video that the Court has reviewed, was simply walking down the mall with a group of other individuals, presumably entirely unaware that [the Defendant] was even present.

Based on this, the trial court ruled that self-defense had not been fairly raised by the proof and declined to provide a self-defense instruction to the jury. Following closing arguments, instruction by the court, and deliberations, the jury found the Defendant guilty of all three offenses as charged.

At a sentencing hearing conducted on July 6, 2023, the parties agreed that the Defendant was a Range I, standard offender and noted that the firearm conviction in count 2 carried a statutorily mandated six-year sentence to be served consecutively to the underlying felony. *See* Tenn. Code Ann. §§ 39-17-1324(e)(1), (h)(1); 40-35-105(b); -112(a)(1), (5). After hearing testimony from the Defendant's aunt in support of him and receiving the presentence investigation report as an exhibit to the hearing, the trial court heard argument from the parties on their respective positions regarding the sentences to be imposed. The State urged the trial court to apply enhancement factors regarding the Defendant's previous criminal behavior, use of a firearm as it related to the attempted murder conviction, and lack of hesitation about committing a crime where the risk to human life was high. *See* Tenn. Code Ann. § 40-35-114(1), (9), (10). Additionally, the

State requested that the trial court give due consideration to the need for effective deterrence and to avoid depreciating the seriousness of the offense. *See id.* § -103(1)(B).

In response, the Defendant encouraged the trial court to focus more on the "least severe measure necessary" in sentencing him. *Id.* § -103(4). The Defendant believed this was appropriate "because the mandatory minimum on an A felony is so high, plus what the Court has to give him in Count 2, [so] the minimum of [fifteen] [years on count 1] achieves the purpose of protecting society and deterring others from doing it." The Defendant conceded that the enhancement factors cited by the State did apply, but he asked the trial court to consider as mitigating factors that the Defendant acted under provocation, in that he had previously been shot; that he turned himself in to law enforcement, thereby assisting the authorities in locating the person involved in the crime; and that the circumstances were unusual because he did not go to the mall with the intent of committing a crime, and he did not know that he would encounter the person whom he believed had shot him while there. *See id.* § -113(2), (10), (11).

The trial court determined that no mitigating factors applied based on the proof introduced at trial and the jury's rejection of the defense presented. The trial court then stated that it would apply two enhancement factors to the Defendant's reckless endangerment conviction, a Class E felony, noting that he had no hesitation about committing a crime where the risk to human life was high and that he used a firearm in doing so. *See id.* §§ 39-13-103(a)(2); 40-35-114(9), (10). As such, the trial court imposed the maximum sentence of two years for the conviction in count 3. *See id.* § 40-35-112(a)(5). The trial court indicated that it would align this sentence concurrently with the sentence it imposed for the attempted first degree murder conviction in count 1. For this offense, the trial court stated that it would apply the enhancement factor regarding the risk to human life, though it noted that the others cited by the State were applicable. However, the trial court then sentenced the Defendant to the minimum sentence of fifteen years for his attempted first degree murder conviction, a Class A felony, in count 1; the mandatory minimum six-year sentence consecutive to count 1 for his employment of a firearm during the commission of a dangerous felony conviction, a Class C felony, in count 2; and the maximum two-year sentence concurrent with count 1 for his reckless endangerment with a deadly weapon conviction, a Class E felony, in count 3. *See id.* § 40-35-112(a)(1), (5).

Following the trial court's denial of his motion for new trial, the Defendant filed a timely notice of appeal.

## II.    ANALYSIS

On appeal, the Defendant contends that (1) the trial court erred by refusing to instruct the jury on self-defense, based on the Defendant's unrefuted testimony that he believed the victim was armed and acting as an aggressor; (2) the evidence was insufficient to support the Defendant's convictions, based upon his lack of premeditation and his belief that he was acting in self-defense; and (3) the trial court abused its discretion by imposing an "excessive" sentence that disregarded applicable mitigation factors.  The State responds that the trial court properly declined to instruct the jury on self-defense, as it was not fairly raised by the proof; the evidence was sufficient to support all three convictions because the Defendant "entered a crowded mall and fired several shots at an unarmed victim"; and the trial court acted within its discretion when it imposed the minimum effective sentence allowable by law.  We address each issue in turn below.

### A.    Self-Defense

The Defendant asserts that the trial court's refusal to instruct the jury on self-defense constitutes reversible error because the absence of this instruction "deprived the jury of the opportunity to consider whether [the Defendant's] actions were justified" and likely affected the outcome of the trial.  The State responds that the trial court properly determined that the proof introduced at trial did not fairly raise the issue of self-defense, and the trial court thus properly refused to provide this instruction.  We agree with the State.

The United States Constitution and the Tennessee Constitution guarantee a right to trial by jury.  U.S. Const. amend. VI; Tenn. Const. art. I, § 6.  "This right encompasses an entitlement to 'a complete and correct charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions.'"  *State v. Fayne*, 451 S.W.3d 362, 373 (Tenn. 2014) (quoting *State v. Dorantes*, 331 S.W.3d 370, 390 (Tenn. 2011)).  The trial court is tasked with providing this "complete charge" to the jury.  *State v. James*, 315 S.W.3d 440, 446 (Tenn. 2010) (quoting *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986)).  The jury instructions must correctly, fully, and fairly set forth the applicable law.  *State v. Brooks*, 277 S.W.3d 407, 412 (Tenn. Crim. App. 2008).  The instructions must be reviewed in their entirety rather than examining individual phrases in isolation.  *Id*.  Because challenges to a trial court's jury instructions are a mixed question of law and fact, our review is de novo with no presumption of correctness.  *Fayne*, 451 S.W.3d at 373.

Tennessee Code Annotated section 39-11-611, which governs claims of self-defense, provided in relevant part at the time of the Defendant's offenses as follows:

- 8 -

(1) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.

(2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

> (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;
>
> (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and
>
> (C) The belief of danger is founded upon reasonable grounds.

*Id.* § 39-11-611(b) (Supp. 2017). A defendant's conduct and mental state must meet an objective standard of reasonableness for the conduct to be justified under this statutory defense. *State v. Bult*, 989 S.W.2d 730, 732 (Tenn. Crim. App. 1998). "Thus, the mere fact that the defendant believes that his conduct is justified would not suffice to justify his conduct." *Id*. Reliance on self-defense is not limited to the exact moment of the assault, but it may be considered in connection with the entirety of the events leading to the assault. *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993) (citation omitted). "If proven to the satisfaction of the jury, self-defense is a complete defense to crimes of violence." *Id*. (citations omitted).

However, the issue of whether a defendant acted in self-defense may not be submitted to the jury unless it is fairly raised by the proof. *See* Tenn. Code Ann. § 39-11-203(c). To make this determination, the trial court must consider the evidence introduced at trial in the light most favorable to the defendant and draw all reasonable inferences in favor of the defendant. *State v. Hawkins*, 406 S.W.3d 121, 129 (Tenn. 2013). When this consideration does not indicate "that the defendant reasonably feared imminent death or serious bodily injury [so as] to justify his use of deadly force," the self-defense instruction should not be given. *State v. Benson*, 600 S.W.3d 896, 907 (Tenn. 2020). More than the

- 9 -

"slightest of evidence" is needed to fairly raise self-defense. *Id.* at 905. Additionally, failure to give such an instruction when the defense has been fairly raised by the proof may be "harmless beyond a reasonable doubt [if] no reasonable jury would have accepted the defendant's self-defense theory." *State v. Perrier*, 536 S.W.3d 388, 404-05 (Tenn. 2017).

This case presents a clear example of why the distinction between a defendant's subjective perception and the objective reasonableness of that perception is so important to the law governing self-defense. *See Bult*, 989 S.W.2d at 732. The Defendant contends that the victim, who he had never seen before, was a threat to him because he was walking near Mr. Ols, whom the Defendant feared, and because the victim had one of his hands inside his clothing, even though there was no indication that the victim or Mr. Ols was aware of the Defendant's presence. Based on this perception, the Defendant opened fire on an unarmed man in a crowded mall. During a lengthy hearing on this issue, the trial court noted that the Defendant's conduct was not objectively reasonable. Following our de novo review, we agree that it was unreasonable for the Defendant to use deadly force in a public place against the unarmed and oblivious victim merely because the victim had a hand inside his clothing and happened to be in proximity to someone else the Defendant feared and considered to be a threat. Not even the "slightest of evidence" was introduced here to show that the Defendant *reasonably* feared death or serious bodily injury at the hands of the victim. *See Benson*, 600 S.W.3d at 905-07; *see also Bult*, 989 S.W.2d at 733 (noting that, despite the defendant's subjective belief to the contrary, the facts presented did not raise any indication that imminent harm was threatened in the context of the defense of necessity). The trial court did not err by refusing to instruct the jury on self-defense in this case.

## B.     Sufficiency of the Evidence

The Defendant's argument on appeal regarding the sufficiency of the evidence to support his convictions is centered on his contention that self-defense justified his actions. In the Defendant's view, this justification requires an acquittal of the attempted first degree murder charge, which thereby precludes consideration of the firearm charge that depended on this offense as the underlying felony. Alternatively, he asserts that the State failed to prove premeditation, likewise negating those convictions. As to the reckless endangerment charge, the Defendant contends that the State failed to show he acted recklessly, as his "actions were specific to the perceived threat" he believed the victim posed. The State responds that a rational trier of fact could have found that it had proven each element of the conviction offenses. As we have already determined that the trial court properly refused to instruct the jury on self-defense, our analysis focuses on the legal sufficiency of the evidence to support each of these convictions.

The United States Constitution prohibits the states from depriving "any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1. A state shall not deprive a criminal defendant of his liberty "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). In determining whether a state has met this burden following a finding of guilt, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Because a guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, the defendant has the burden on appeal of illustrating why the evidence is insufficient to support the jury's verdict. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). If a convicted defendant makes this showing, the finding of guilt shall be set aside. Tenn. R. App. P. 13(e).

"Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). Appellate courts do not "reweigh or reevaluate the evidence." *Id*. (citing *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978)). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Therefore, on appellate review, "the State is entitled to the strongest legitimate view of the trial evidence and all reasonable or legitimate inferences which may be drawn therefrom." *Cabbage*, 571 S.W.2d at 835.

1.      Attempted First Degree Murder

Criminal attempt, as charged to the jury in this case, occurs when a person acts

> with the kind of culpability otherwise required for the offense . . . [and] [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a)(2), (3). In this case, the Defendant was charged with the criminal attempt to commit first degree murder wherein the victim suffered serious bodily

injury.  First degree murder in this context is defined as "[a] premeditated and intentional killing of another."  *Id.* § 39-13-202(a)(1).  A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result."  *Id.* § 39-11-106(a)(20) (2020).

> [P]remeditation is an act done after the exercise of reflection and judgment. Premeditation means that the intent to kill must have been formed prior to the act itself.  It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time.  The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* § 39-13-202(d) (quotation marks omitted).[3]  "Premeditation may be inferred from the manner and circumstances of the killing."  *Finch v. State*, 226 S.W.3d 307, 318 (Tenn. 2007) (citation omitted).  Several circumstances may bear on the existence of premeditation, including, but not limited to:

(1) The use of a deadly weapon on an unarmed victim;

(2) The particular cruelty of the killing;

(3) Threats or declarations of intent to kill;

(4) The procurement of a weapon;

(5) Any preparations to conceal the crime undertaken before the crime was committed;

(6) The destruction or secretion of evidence of the killing;

(7) Calmness after the killing;

(8) Evidence of motive;

(9) The use of multiple weapons in succession;

---

[3] This subsection was redesignated in 2021 and is now located at Tennessee Code Annotated section 39-13-202(e).  2021 Tenn. Pub. Acts, ch. 394, § 1.

(10) The infliction of multiple wounds or repeated blows;

(11) Evidence that the victim was retreating or attempting to escape when killed;

(12) The lack of provocation on the part of the victim; and

(13) The failure to render aid to the victim.

*State v. Reynolds*, 635 S.W.3d 893, 917 (Tenn. 2021) (citations omitted). The list of specific circumstances developed through case decisions is not exhaustive, however, and the trier of fact "is not limited to any specific evidence when determining whether a defendant intentionally killed the victim after the exercise of reflection and judgment." *State v. Davidson*, 121 S.W.3d 600, 615 (Tenn. 2003) (internal quotation marks omitted).

Here, the evidence established that the Defendant drew a firearm, chambered a round, pointed the firearm at the victim, had his arm pushed down by his companion, then again raised the firearm and shot at the victim three times, hitting him once in the chest, before fleeing. All indications, as developed by the victim's testimony and the video recording of the incident, point to the fact that the victim was unaware of the Defendant's presence, and in fact, did not know who he was at all. Thus, the Defendant used a deadly weapon on an unarmed victim without provocation, and he fled the scene rather than render aid after he shot the victim. *See Reynolds*, 635 S.W.3d at 917. While the Defendant testified at trial that he acted in fear for his life, the jury reviewed the video recording of the shooting, heard the testimony of all of the witnesses, and rejected the defense's theory of the shooting when it found him guilty of attempted premeditated first degree murder. The evidence in this record is sufficient to support the jury's conclusion.[4] The Defendant is not entitled to relief.

2.      Employing a Firearm During the Commission of a Dangerous Felony

To convict the Defendant of this offense, the State had to show that the Defendant intentionally, knowingly, or recklessly employed a firearm during the commission of or attempt to commit a dangerous felony. Tenn. Code Ann. § 39-17-1324(b). Attempt to commit first degree murder is a dangerous felony. *Id*. § -1324(i)(1)(A). The term "employ"

---

[4] Though not challenged on appeal, the presence of serious bodily injury was satisfied by the victim's testimony and copious medical records establishing that he was hospitalized for an extended period, required multiple surgeries, lacked memory of the event or his time in the hospital, and had permanent scarring. *See* Tenn. Code Ann. § 39-11-106(a)(36) (2020) (defining serious bodily injury).

means "to make use of." *Fayne*, 451 S.W.3d at 370. There is no dispute in this case that the Defendant intentionally shot the victim. Having found beyond a reasonable doubt that the Defendant committed the offense of attempted first degree murder by shooting the victim in the chest with a firearm, a rational juror could also find that the Defendant employed a firearm during the commission of this offense based on the evidence presented in this case. *See Jackson*, 443 U.S. at 319. The Defendant is not entitled to relief.

### 3. Reckless Endangerment with a Deadly Weapon

A person commits reckless endangerment who "recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury." Tenn. Code Ann. § 39-13-103(a). A threat of death or serious bodily injury is "imminent" when a person is placed in a reasonable probability of danger as opposed to a mere possibility of danger. *State v. Payne*, 7 S.W.3d 25, 28 (Tenn. 1999). The State may satisfy its burden by demonstrating that a "person or class of persons" other than the defendant was in the zone of danger. *State v. Goodwin*, 143 S.W.3d 771, 778 (Tenn. 2004) (quoting *Payne*, 7 S.W.3d at 28), *abrogated on other grounds by State v. Watkins*, 362 S.W.3d 530 (Tenn. 2012). Reckless endangerment committed with a deadly weapon is a Class E felony. Tenn. Code Ann. § 39-13-103(b)(2).

A "deadly weapon" includes "[a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id.* § -11-106(a)(6)(B). The statutory definition of "deadly weapon" expressly includes firearms. *Id.* § -106(a)(6)(A).

A person "acts recklessly . . . when the person is aware of, but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." Tenn. Code Ann. § 39-11-106(33). Further, "[t]he risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint." *Id*.

A threat of death or serious bodily injury is "imminent" when a person is placed in a reasonable probability of danger as opposed to a mere possibility of danger. *Payne*, 7 S.W.3d at 28. The State may satisfy its burden by demonstrating that a "person or class of persons" other than the defendant was in the zone of danger. *Goodwin*, 143 S.W.3d at 778 (quoting *Payne*, 7 S.W.3d at 28).

The Defendant in this case discharged a firearm in a public mall occupied by a number of other shoppers. The video recording of this shooting depicts many other

individuals walking up and down the mall concourse, and at least three individuals were directly between the Defendant and the victim at the time he began shooting. Sgt. Barr testified that, based on his review of the video, these three individuals—as well as any other persons behind the victim's group outside the frame of the video—were in the "zone of danger" created by the Defendant's gunshots. *See id.* The forensic technician who responded to the scene testified that the concourse was so "long and straight" that it was impossible to determine where the bullet fragments—other than the one embedded in the victim's chest—ultimately landed, but they could have been "anywhere in the mall." Finally, the Defendant himself testified that he knew other people were in the mall, but he "couldn't think about that" when he started shooting, thereby admitting that he consciously disregarded the risk of death or serious bodily injury his actions posed to those other individuals. *See* Tenn. Code Ann. § 39-11-106(33). His argument that his actions were directed only at the victim is without merit when viewed within the lens of the statutory definition of recklessness. *See id.* Accordingly, we conclude that sufficient evidence existed for a rational juror to find beyond a reasonable doubt that the State had proven all the essential elements of reckless endangerment with a deadly weapon. *See Jackson*, 443 U.S. at 319. The Defendant is not entitled to relief.

## C.     Sentencing

The Defendant contends that the trial court imposed an excessive sentence and erroneously disregarded mitigation factors that he believes are appropriate. We note that, as the State points out, the Defendant received the minimum effective sentence allowable by law in this case. *See* Tenn. Code Ann. §§ 39-17-1324(e)(1), (h)(1) (establishing the mandatory minimum six-year sentence for the applicable employment of a firearm conviction and mandatory consecutive alignment); 40-35-112(a)(1) (noting that the minimum sentence on a Class A felony conviction for a Range I offender is fifteen years). Because of the trial court's discretionary concurrent alignment of the Defendant's reckless endangerment sentence, this court has no ability to provide any practical relief regarding the Defendant's aggregate sentence. However, the trial court did exercise its discretion in imposing the maximum two-year sentence for the reckless endangerment conviction. *See id.* § 39-13-103(b)(2); 40-35-112(a)(5). As such, we review the propriety of the trial court's sentencing determination in that regard.

When an accused challenges the length of a sentence or manner of service, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The party challenging the sentence imposed by the trial court has the burden

of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; *see also State v. Arnett*, 49 S.W.3d 250, 257 (Tenn. 2001).

This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. *See State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). Those purposes and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," a punishment sufficient "to prevent crime and promote respect for the law," and consideration of a defendant's "potential or lack of potential for . . . rehabilitation[.]" Tenn. Code Ann. § 40-35-102(1), (3), (5); *see Carter*, 254 S.W.3d at 343. Ultimately, in sentencing a defendant, a trial court should impose a sentence that is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2), (4).

On appeal, the Defendant makes no specific allegations regarding the sentence for any particular offense, but he merely states that "the overemphasis on enhancement factors and the insufficient weight given to mitigating circumstances" resulted in an excessive sentence that should be reduced. We note that the Defendant cites to no authority regarding these propositions, and he does not acknowledge that no practical relief is available based on the alignment and the applicable law for the conviction offenses that dictate his aggregate sentence.

In this case, the trial court imposed sentences within the appropriate range, discussed the enhancement and mitigation factors it relied upon, and acknowledged its consideration of the parties' arguments regarding the principles and purposes of sentencing. *See Bise*, 380 S.W.3d at 709-10. The Defendant does not challenge these facts on appeal; he merely asserts that the proffered mitigating circumstances were given insufficient weight. In essence, the Defendant is asking this court to reweigh the factors the trial court applied when making its sentencing determination. This we may not do. *See id.* at 706 ("[M]ere disagreement with the trial court's weighing of the properly assigned enhancement and mitigating factors is no longer a ground for appeal."). The Defendant is not entitled to relief.

D.      Correction of Clerical Errors

While we affirm the judgments of the trial court, remand is necessary to correct clerical errors in the uniform judgment documents. Tennessee Rule of Criminal Procedure 36 provides that "the court may at any time correct clerical mistakes in judgments, orders, or other parts of the record, and errors in the record arising from oversight or omission." As to all three counts, corrected judgment forms must be executed to reflect that the Defendant was found guilty of these offenses and that the service of his felony sentences is in TDOC. Additionally, as to count 2, the mandatory minimum sentence length of six years must be noted based on the Defendant's conviction under Tennessee Code Annotated section 39-17-1324. Finally, as to count 3, the assessment of the statutorily mandated fifty-dollar fine for reckless endangerment offenses must be noted on the corrected judgment form. *See id.* § 39-13-103(b)(5).

## III.      CONCLUSION

In consideration of the foregoing, we affirm the judgments of the trial court but remand for entry of corrected judgment forms consistent with this opinion.


 s/ Kyle A. Hixson
KYLE A. HIXSON, JUDGE